**FIRST CENTRAL TRUST CO. OF AKRON, Liquidation of, In re.**

Common Pleas Court, Summit County.

No. 100319-6193.   Filed January 21, 1944.

90

Clemens R. Frank, Asst. Atty. Genl., Fred E. Renkert, Akron, Special Asst. Atty. Genl., for Supertintendent of Banks.

John C. Frank, of Frank & Ream, Akron; Cletus· G. Roetzel, of Wise, Roetzel & Maxon, Akron; Robert Guinther, of Slabaugh, Seiberling, Guinther & Pflueger, Akron; T. W. Kimber, of Musser, Kimber & Huffman, Akron; Edmund Burroughs, of Buckingham, Doolittle & Burroughs, Akron; William E. Pardee, Akron; William J. Laub, Akron; William A. Walsh, of Nelan & Walsh, Akron; Clyde F. Beery, of Beery, Underwood, Ryder & Kroeger, Akron; and Paul C. Laybourne, Akron, for Various Stockholders.

C. L. Dinsmore, of Myers, Dinsmore & Whittemore, Akron; Fred Ormsby, of Ormsby, Smith & Ormsby, Akron; Bruce W.

Bierce, of Brouse, McDowell, May & Bierce, Akron; and Rice A. Hershey, of Gottwald, Hershey & Hatch, Akron, for Various Depositors.

## OPINION

By WATTERS, COLOPY and EMMONS, JJ.
### GENERAL STATEMENT

This matter comes before the court upon the application of the Superintendent of Banks of the State of Ohio for authority and direction as to payment of so called "excess funds," to-wit: cash remaining after payment to depositors and creditors of the full face amount of their claims.

The application as amended in minor details at the outset of the hearing contains all the pertinent facts, including the Plan of Resumption of business, which came before the six judges of this court in November and December of 1933, and was approved by journal entry filed December 2, 1933. We incorporate all the facts stated in said application, and the decree of the court and many pertinent facts are discussed hereinafter.

The First Central Trust Company (old bank) had been under a restricted 1% withdrawal plan by order of the Superintendent from about March 2, 1933, to March 5, 1933, when the Federal Government closed it. On June 21, 1933, the Superintendent took over the bank for liquidation under §§710-90 and 710-91 GC, and other statutes.

On July 22, 1933, the Superintendent ascertained that the assets of the bank would be insufficient to pay its debts and liabilities under the law, and assessed the full one hundred percent stockholders superadded or double liability, as it is popularly called. The bank's outstanding shares of stock were $7,416,450. As of the date of filing the application some $3,454,627.85 of assessed double liability had been collected. Then after paying the full dividend of thirty percent (or setting aside enough to pay all creditors and depositors one hundred percent of the face value of their claims) the Superintendent of Banks has on hand roughly $1,243,000.

This surplus is claimed generally by two groups,—the depositor group, which says it should be given to them as interest, or as their share, and the stockholders who have paid all or a portion of their assessed superadded liability, who contend that the one hundred percent principal payment to depositors and creditors is full payment.

Although throughout this opinion we refer to depositors and other creditors, we believe it is conceded as a fact that there is only one class of creditors left, and that is, depositors.

The shareholder group contend that the depositors and other creditors are not entitled to this excess fund which they claim represents the balance of the assessed superadded or double liability under the law, and further contend that if they are incorrect in their assertion, then the creditors and other depositors waived their right to it, if any, under the plan of resumption and its approval by the court, under which participation certificates were issued to them under §710-89a and other sections of the Ohio Banking Code.

Various parties of each group have intervened and are represented by counsel, who with the Superintendent of Banks, represented by the Attorney General Thomas J. Herbert, through Assistant Attorney General Clemens Frank and Special Assistant Attorney General Fred E. Renkert, have presented evidence and exhaustive oral argument and briefs. Several days were devoted to opening statements and presentation of evidence. Thereafter a recess was had of several weeks, during which time counsel prepared and filed their briefs. Thereafter some three days were spent in hearing oral arguments. The matter has been fully and carefully presented.

We have spent nearly two weeks reading and analyzing the briefs and authorities, and upon independent research and study.

We recognize the importance of this matter to those concerned, and realize that to a large extent the problems presented are new and novel and not previously passed upon by the reviewing courts of this state.

It might be mentioned also that the problem, except as to this case, is a moot question since the electorate of Ohio adopted an amendmnt to the Ohio Constitution doing away with superadded liability following the federal provision for insurance of deposits up to five thousand dollars. The amendment abolishing stockholders. superadded liability became effective in July of 1937, but the old law is in full force and effect as far as the instant case is concerned.

## DISCUSSION OF THE RIGHTS GENERALLY UNDER THE LAW.

To begin let us first examine some statutory and constitutional provisions governing this matter.

**Sec. 710-91 GC.** "Title of **assets, property,** etc. vested in superintendent of banks, when; posting of notice to act as bar

to any attachment, etc.; **interest on deposits.** Immediately upon the posting of notice on the door or doors of a bank by the superintendent of banks, as provided in §710-90 GC, the possession of **all assets and property of such bank of every kind and nature,** wheresoever situated, shall be deemed to be transferred from such bank to, and assumed by the superintendent of banks; * * * AND INTEREST ON DEPOSITS SHALL THEREUPON CEASE TO ACCRUE AT THE RATE SPECIFIED IN THE CONTRACTS OF DEPOSIT, BUT WITHOUT PREJUDICE TO THE RIGHTS OF DEPOSITORS TO RECEIVE INTEREST, WITH OTHER CREDITORS, FROM THE DATE OF SUCH POSTING, OUT OF THE FUNDS PRODUCED BY THE LIQUIDATION OF SUCH BANK, BEFORE DISTRIBUTION IS MADE TO SHAREHOLDERS ON THEIR SHARES." (Effective March 31, 1933).

**Section 3 of Article XIII of the Ohio Constitution** recites that:

"Stockholders of corporations authorized to receive money on deposit shall be held individually responsible * * * for all contracts, debts and engagements of such corporation." (in effect as far as this case is concerned—abolished Ohio 1937).

In the Ohio Supreme Court case of **Snider v The Banking & Trust Company, 124 Oh St 375,** we find:

Syllabus (1) **Section 3 of Article XIII of the Ohio Constitution** creates an additional liability against stockholders of corporation authorized to receive money on deposit, for all contracts, debts, and engagements of such corporation. The liability thus created is complete and self-executing.

(2) The provisions of §§710-75, 710-89 and 710-95 GC, are regulatory and procedural and neither augment nor diminish the constitutional rights of creditors.

**Sec. 710-95 GC** clearly indicates that the Legislature considered "contracts, debts and engagements" as used in the Constitution to include all liabilities. **Sec. 710-95 (9)** is as follows: "If he ascertains that the assets of such bank will be insufficient to pay its **debts and liabilities.**"

See also the last sentence of §710-75 GC, which again contains the words "debts and liabilities."

In Culp v First Com. Sav. Bank, 288 Michigan, 646, we find:

Syllabus (1) "Since at the time a bank was closed by governor's proclamation all assets of the bank together with

assessments (we add—double liability assessments) constitute a trust fund for the payment of claims of depositors who had a right to insist upon the liquidation of the assets, the only right of a stockholder who is subject to and who pays assessment is to share in any balance of assets or funds remaining after the claims of depositors were paid in full."

It is the general rule that payment in full includes interest. See Binsfield case, 6 Fed. Supplement, 29.

In 303 U. S., 406 (1938), Ticonic National Bank v Sprague, et, which approves the old case of Richmond v Irons, 127 U. S. 27 (1887) at page 410, the Supreme Court said:

"As incident to the right to recover an unexpended balance in a deposit, a depositor is entitled to interest as damages for the failure to pay that balance."

Counsel for stockholders contend that this is the Federal rule, and is so held because the Federal courts regard stockholders liability as an asset of the bank which they contend is not the Ohio rule. Strictly speaking that may or may not be true. Later on we point out that under the plan as adopted by the court in our opinion stockholders liability was to be considered as an asset.

Altnough Michigan follows the trust fund theory as indicated above, in 288 Mich. 646, it also follows 303 U. S. 406 (above). See 291 N. W. 228.

Stein v Delano, 121 Fed. (2d), 975 is a very well reasoned case which discusses the history of interest, generally, the reason and purpose of double liability, and what becomes of such a surplus as we have here. We recommend a full reading of the case. No resumption plan is involved.

Syllabus (4) "The statutory liability of stockholders extends to interest on debts of corporation during administration of its affairs in case of bankruptcy, insolvency or receivership, where, because of nature of the debt, right to recover interest would have existed against the corporation."

The court held that the depositors who had received their principal in full were entitled to have the surplus in the liquidating receiver's hands distributed to them as damage or legal interest, as against the claim of stockholders who had been compelled to pay superadded liability that they were entitled to have the unused amount of their assessment returned to them. (See Syllabus No. 1). Stein v Delano, supra.

The court also pointed out that in the banking business the owners (shareholders) make most of the profit, while the customers (depositors) take most of the risk. To balance this, and to make the shareholders more zealous in protecting the depositors' interests, double liability through constitutional and statutory provisions, was provided in most states, and was the rule for many years. (See 3 Zollman Banks and Banking, page 1612). The court further pointed out that the terms "contracts, debts and engagements" cover principal and interest due creditors, and not merely the principal amount of the indebtedness.

We believe that the whole theory and purpose of the various constitutional and statutory provisions having to do with the liquidation of banks, the assessment of super-added liability and like provisions are all framed primarily to protect the depositor and other creditors of the bank.

We have now as of 1937 abolished double liability by constitutional amendment, but we have in its place federal insurance of deposits up to five thousand dollars. Does any one believe that we could have so amended the Ohio Constitution if it had not been for this substituted protection given depositors?

We believe that regardless of whether you treat double liability as an asset, or the fund derived therefrom as a trust fund for the benefit of creditors, that the Stein v Delano case is the law generally, and of Ohio in the absence of a contract or plan of reopening which by its particular terms would change his legal right to interest.

Omitting from consideration for the present the so-called Reopening Plan, and its approval by the five judges, we find from §710-91 GC, that upon posting of notice by the Superintendent of Banks—"all interest on deposits shall thereupon cease to accrue at the rate specified in the contracts of deposit." This means clearly that contract interest then ceases on all deposits, (June 21, 1933)—"but without prejudice to the rights of depositors to receive ('damage or legal') interest with other creditors, from the date of such posting (June 21, 1933) out of the funds produced by the liquidation of such bank, before distribution is made to the shareholders on their shares." (Section 710-91 GC.) We insert ("damage or legal") which by law and by implication accrues under §710-91 GC, and becomes payable if the contingency mentioned in §710-91 GC, occurs.

It will be noted that the Legislature said "out of the funds produced by the liquidation of such bank."

The Legislature did not say "out of the funds produced by the liquidation **of the ASSETS or property of such bank.**" If it had meant that, it could easily have said it definitely.

We hold that "liquidation" is used in §710-91 GC in the broad sense of "winding up" and includes the Superintendent of Banks' duty or acts of collecting double liability by virtue of the banking statutes, §§710-75 and 710-95 GC, which set up the superintendent's duties in regard to assessing and collecting superadded liability.

We should bear in mind that the statute, §710-91 GC, does not say all interest shall cease. **Only interest on deposits at contract rate ceases. Thereupon under the law. damage or legal interest starts to run.** Of course it does not become important unless there is a surplus out of which to pay it, which arises from the liquidation of the bank. Upon seizure for liquidation all creditors, including depositors, are thus placed on an equal basis as to interest.

The argument, that depositors having accepted the principal have waived all interest, is not sound in law, for in insolvency cases there is no voluntary acceptance of principal, because a creditor is precluded from rejecting the dividends and demanding payment of principal and interest in full. When the last principal dividend in our case was actually paid, it was a matter of record that there was an excess or surplus, and that it would be later determined by this court as to how it would be distributed.

See also 32 Mich. Law Review, page 1084 and 1085.

From the plan, and the decree of approval by the court, as of December 2, 1933, we find the following in paragraph:

(4) "The bank will resume business * * * but the present deposit and other liabilities of the bank * * * shall be proportionately reduced in the amount of 75%, so that the resuming bank shall be liable at the date of resumption to every depositor **only in the amount of 25% of his frozen deposits.** (Less off-sets and proper deductions) * * *."

(5) "The equity remaining in the securities and property to be pledged with the Reconstruction Finance Corporation as security for its said new loan, **together with the assessed** dividends, if any, upon capital stock of the resuming bank, and the capital stock itself, **shall all,** to the extent hereinafter provided, **be set aside in the hands of the superintendent of banks** * * * **for the payment of the remaining 75% owed to known depositors and creditors of the present bank. Participation certificates in such assets, bearing no interest, will be issued to the**

**depositors and creditors by the superintendent of banks,** on request of any one entitled thereto, **and such certificates shall be in lieu of the amount by which the deposit and other liabilities owed to the holder have been reduced.** The amounts by which the deposit and other liabilities of the resuming bank are so reduced, whether evidenced by participation certificates or not, shall in no sense be an obligation of the resuming bank, and no liability shall be imposed upon it for the payment thereof, **but such amounts shall be paid only out of the assets so set aside in the hands of the superintendent of banks."**

Let us see how the Reopening Committee interpret paragraph (5). In the booklet published (Carter's Exhibit 19) and newspaper advertisement called "Questions and Answers" (in question No. 7 we find):

"7. Q. What assets will be behind the 80% Participation Certificates?

A. (a) The equity in the assets pledged with RFC as security for its loan.

(b) · **The assessed stockholders' liability.**

(c) The $500,000 par value of capital debentures issued by the resuming bank.

(d) The capital stock, itself, of the resuming bank, and dividends thereof, if any."

See also Question and Answer No. 65, which is set forth in full on page 23 of this opinion.

These matters show beyond a doubt that the drafters and sponsors of the Plan considered that the plan (5) made assessed double liability an asset of the bank, and it was to be liquidated by the superintendent of banks, as such.

The court, in approving the plan, approved .the identical language of paragraph (5) of the plan, and had before it the "Question and Answer" booklet setting forth the interpretation by its sponsors.

**Section 710-91 GC,** where it speaks of "all assets and property of such bank of every kind and nature" we believe to be broad enough to declare "superadded liability" an asset of the bank. But in spite of that, assuming that it does not so declare, and assuming that the rule in Ohio is contrary to the Federal rule, it is obvious, we hold, that the court in adopting the plan decreed that the fund to be derived from stockholders liability was to be considered assets in the hands of the superintendent of banks. It seems to us that to declare

otherwise would be to put a strained construction on the language pointed out in the decree, which approved the plan, which plan was approved by the superintendent of banks and the creditors, depositors and shareholders, and thereupon became a binding contract.

And we again call attention to the intention of the Re-opening Committee's Booklet, "Questions and Answers" to treat it as an asset.

Can it now be denied that all through assessed double liability was considered by every one as an asset back of the Participation Certificates? Certainly not.

In Wood County Common Pleas Court case, **In Matter of Liquidation of Sun Savings Bank Company, 4 OO 519,** the bank had been closed for liquidation. Stockholders liability had been assessed and collected. One hundred percent of the principal of the claims of creditors and depositors had been paid. An excess remained,—an excess of funds derived from double liability assessments. The court directed that the excess be distributed among creditors as interest, and refused to return it to stockholders who had paid on double liability. (This is the case that Superintendent of Banks, Mr. Lien, had in mind while in court before Judge Fritch in 1942, when the question of interest was discussed. We shall refer to that later.)

Attention is also called to the case of **Abbott v The Superintendent of Banks, 8 OO 134,** another Common Pleas decision holding the same as the case of Sun Savings Bank, supra.

In the absence of a plan wherein the depositor may have waived his interest, we feel that these cases are the law of Ohio.

We should never lose sight of the fact that the entire procedure of liquidation has for its purpose the best interests of the depositor and other creditors. That is why the court must pass on so many matters during its progress, to see that their interests are fully protected.

### UNDER THE PLAN OF RESUMPTION

The plan under which the bank resumed business was formulated under and by virtue of §710-89a GC. The two statutory requisites for the consummation of such a plan are the consent or approval of the state Superintendent of Banks and its approval by the Court of Common Pleas. No consent of the stockholders or depositors is required. However, in the instant case, the Reconstruction Finance Corporation, before it would agree to make a new loan of $27,500,000, about one-half of which went to pay off a prior loan made by said

corporation, required as a condition precedent that eighty-five percent of the depositors and shareholders consent to the re-opening plan. From the balance of said loan $13,500,000 went to pay the initial 25% dividend to depositors and creditors.

When the plan was presented for approval to the then six judges of the Common Pleas Court, in November, 1933, in case No. 102,307, 86.9% of the depositors and other creditors and practically all shareholders had approved the plan, as had the Superintendent of Banks as aforesaid.

The entire record and transcript of the evidence and arguments and comments of the court and of counsel for the reopening committee, and for the depositors, during the several days of trial in said cause No. 102,307, is before us, also the court's opinion and decree.

We believe it is only fair to say that it was then practically conceded that it was for the best interests of all creditors, depositors and shareholders that the bank be reopened

These paragraphs in the Plan which were in dispute, or at all questioned, were taken up one at a time for full discussion and debate.

Thereafter, and following further study and deliberation, the court approved the plan by journal entry filed December 2, 1933, which is incorporated herein by reference.

It is now certain that the court as then constituted performed a distinct service to all those concerned, and to the community as well, in allowing the bank to resume business. (We should say in passing that no one of the three judges hearing this matter now was then on the court.)

The Superintendent of Banks of course in said cause represented the depositors, creditors and shareholders in his official capacity, and in addition they were represented by counsel as aforesaid.

No appeal was taken from that judgment of the court, and it is of course res adjudicata as to all matters that were then before the court or that could have been properly raised at said time.

For many months before the matter was presented for court approval, the reopening committee mailed out letters, and ran paid notices in the local newspapers, setting forth the plan of reopening, and urging the depositors, other creditors and shareholders to consent to the same. See particularly Carter's Exhibit 19, the booklet, "Questions and Answers" and newspaper advertisements.

Counsel for the depositors have offered many of these matters, newspaper notices, and other evidence, for the purpose

of showing that the plan was misrepresented to the depositors in its true light, and that such letters, newspaper notices, etc., created the impression that the depositors would lose none of their rights if they consented. There is no claim of direct fraud in that respect, but only of misrepresentation or perhaps concealment, and that having so held out the plan, the stockholders, through the reopening committee, so acting, are now estopped to say that the plan as consented to and approved by the court, took away the depositors' rights.

All of the evidence of this nature as offered was objected to, and this court took its admissibility under advisement. We now admit all of it with exceptions to those objecting.

However, we do not find that there was any misrepresentation, concealment, fraud or other misconduct in said respects. In fact we believe that the evidence shows that the reopening committee and its counsel in said respects, in question, conducted the matter in a wholly proper, respectable and honorable manner. It is evident from the evidence on the trial for resumption that the booklet "Questions and Answers" was before the six judge court.

Paragraph (5) of the plan, and as approved by the court and merged in the decree, is set forth above. Attention is now called to this wording:

"Participation certificates in such assets **bearing no interest**, will be issued to the depositors and creditors by the Superintendent of Banks * * * **and such certificate shall be in lieu of the amount by which the deposit** and other liabilities have been reduced."

Payment after December 2, 1933, of the initial dividend of 25% was effected by the issuance of a so-called "deposit release warrant" to the depositors, executed by the resuming bank. (See appendix 3 of application.)

On the reverse side of said deposit release warrant is printed (in part):

"The undersigned * * * payee, hereby directs * * * Fulton Superintendent of Banks * * * to convert the certificate of claim heretofore issued to the payee into a certificate of participation in accordance with the Plan of Reorganization * * * heretofore approved by the Summit County Common Pleas Court."

Also when the depositor or other creditor presented the certificate of claim, at the time the 25% was received, the amount was credited on the certificate of claim, and thereupon the Superintendent of Banks, by use of a rubber stamp, and in pursuance of the plan, stamped the following legend upon the certificate of claim. We give it in part only.

"* * * this Certificate of Claim * * * is hereby converted into a Certificate of Participation * * *. This Certificate shall bear no interest * * *."

Turning now to §710-89a GC, under which the bank was reopened and the plan created and approved by the court. It is as follows:

"Resumption of business upon conditions approved by court; conditions. Such bank may with the consent of the superintendent of banks, resume business upon such conditions as may be approved by the court of common pleas in and for the county in which such bank is located. If deemed necessary by the court, such conditions may include, among others, reasonable restrictions upon the withdrawal of deposits and the payment of other liabilities, **and may also provide for a proportionate reduction of the deposit and other liabilities of such bank and the substitution in lieu of the amount by which such deposit and other liabilities are reduced, of trust or participation certificates in assets set aside for the payment thereof;** provided that certificates shall in no event impose any liability for the payment thereof upon such bank as reopened except to the extent of the assets so segregated.

If consented to by the superintendent of banks and deemed necessary and proper by the court, such conditions may include requirement that not less than two weeks' notice be given by publication or otherwise, as the court may find reasonable, and may direct, to the depositors, creditors and stockholders of such bank, and that a fair and equitable proportion of the assets of such bank and of the stockholders' double liability payments in possession of the superintendent of banks, in proportion to the aggregate amount of their claims, to be ascertained by the court, shall, for the benefit of those depositors and creditors who shall file with the clerk of the court written objections to the proposed resumption of business by such bank on such conditions, be disposed of as the court may direct or be left in the possession of the superintendent of banks to be

liquidated. All such objections shall be filed within a time fixed by such court and stated in such notice. All depositors and creditors, including the state or any political subdivision thereof, if a creditor, who shall fail to file such objections within such time fixed by the court, shall be conclusively deemed to have consented to the resumption of business by such bank upon the conditions approved by the court, and shall be bound by the order of the court approving the same. The order of the court may provide for barring the objecting depositors and creditors from all interest in the assets of the bank and in the stockholders' double liability payments in the possession of the superintendent of banks other than that portion of said assets and of said double liability payments segregated for the benefit of such objecting depositors and creditors as hereinbefore provided.

The conditions hereinbefore set forth shall be without prejudice to, or in limitation of, the power of the court, with the consent of the superintendent of banks, to prescribe other or different conditions."

**Under the court decree** approving the plan, Section (4) we find:

"The bank will resume business under its present name * * * but the present **deposit and other liabilities** of the bank after allowance of set-offs shall be **proportionately reduced in the amount of 75%, so that the resuming bank shall be liable at the date of resumption to every depositor, only in the amount of 25% of his frozen deposits** (less offsets and proper deductions) which may be withdrawn by him, etc. * * *."

Surely under §710-89a GC, all the court can do is to relieve **the resuming bank** of certain liabilities, and impose other conditions for its benefit. In this case the court relieved the resuming bank of all liability other than 25% of the amount due creditors and depositors, and transferred the remaining 75% liability to or against the remainder of the assets held by the Superintendent of Banks after transfer to the resuming bank of the $1,300,000, and as pointed out before, the assets also included funds from double liability.

The plan and its approval by the court of course could not, let us say, pay the creditors 25% of their claim, and then cut down the percentage of the claim remaining to, let us say, 50% instead of 75% as against the assets held by the Superintendent of Banks.

The primary reason for §710-89a GC, is to allow the bank to resume. To that end all reasonable and constitutional conditions can be attached. But in the absence of specific agreement or waiver by the creditors, the court cannot impair their constitutional or statutory rights to assert their claim fully.

The court further said, after approving various items of the Plan: (See court's decree) in re reopening.

"It is further ordered that in lieu of the amount by which the deposit and other liabilities (of the First Central Trust Company) are reduced, trust or participation certificates be issued providing for participation in assets set aside for the payment thereof, which said certificates shall in no event impose any liability for the payment thereof upon The First Central Trust Company as reopened."

NOTICE: No mention of "bearing no interest" appears in the above paragraph.

It will be noted that in clause (5) of the Plan as approved by the court, the following wording appears:

"Participation certificates in such assets, bearing no interest, will be issued to the depositors and creditors by the Superintendent of Banks. * * *."

The words "bearing no interest" were omitted from the courts' decree in the paragraph second above this, beginning "It is further ordered * * * etc." Could it be that the words were considered by the court as mere surplusage where used in the body of the plan as approved by the court? In other words, when the depositors signed accepting the plan, and the court approved it, did the words "without interest" or "bearing no interest" waive the right to interest as allowed in the Constitution of Ohio, and in §710-91 GC, or was it simply a postponement to the same condition which we have under §710-91 GC? In said section it will be recalled that the Legislature provided that "and interest on deposits shall thereupon cease to accrue at the rate specified in the contracts of deposit, but without prejudice to the rights of depositors to recover interest, with other creditors, from the date of such posting, out of the funds produced by the liquidation of such bank, and before distribution thereof is made to shareholders on their shares."

Was the Certificate of Participation anything more than a mere evidence of the claim of the depositor or other creditor? In other words, did the words "bearing no interest" operate

further than to protect the Superintendent of Banks from any liability on the Certificate of Participation as such, and relegate the depositor to his rights under the law generally, and §710-91 GC specifically, postponing his right to interest on his claim subject to §710-91 GC?

The remaining 75% was not guaranteed by the resumption plan to be entirely paid, because no one knew what the combined assets under the plan, and including superadded liability, would eventually be. There is nothing in the plan as approved to the effect that if there should be a surplus remaining after payment of the principal in full, interest would not be paid. The matter was contingent on the future existence of a surplus. Such surplus came into existence, from which interest can be paid. By §710-91 GC, contract interest ceased on June 21, 1933. There would be no occasion to compute legal interest on the claims from time to time because it would never be payable until the surplus resulted. The words "without interest" were inserted in the Certificate of Participation agreeably to the terms of said statute (§710-91 GC) without however limiting the rights of depositors and other creditors to receive damage interest at the legal rate provided it became available.

On January 15, 1942, Judge E. D. Fritch, now retired, was hearing an application in this same cause in the bank liquidation of this bank, sub-number 5617 of the main case 100,319. Judge Fritch, while serving during the first eight years of the liquidation of the bank, devoted a large part of his time to the hearing of various applications and problems of the liquidation. He was one of the six judges who passed on the plan to reopen the bank.

In the hearing mentioned (No. 5617) which is before us (Carter's Exhibit 9) we have the transcript of the testimony and comments of the court, counsel, Superintendent of Banks, Rodney P. Lien, and others present. The application before the court concerned a dividend to creditors, or really to depositors, of 20%, 16% cash and 4% stock (of new bank) held by the Superintendent.

Up to that time, January 15, 1942, dividends already paid out amounted to 51%. The proposed dividend would bring it up to 70 or 71%.

Beginning on pages 24 and 25 of said Carter's Exhibit 9, the court was discussing the plan of resumption. Then on page 26 the court commented on and read §710-91 GC. Judge Fritch then said: (bottom of page 26 and top of page 27)

"The Supreme Court has indicated, and I believe correctly so, that (meaning §710-91 GC) does not mean that a depositor cannot receive any interest. **First the depositors must be paid in full. Then if there is any money available they are to pay interest. The depositors and creditors will be entitled to interest on their claims from the date of the closing of the bank up to the end of the liquidation before any money goes to the stockholders.**" (Emphasis ours.) "Can you conceive of any possibility of paying the balance to those depositors and interest on their claims from June 21, 1933, up to the date of final liquidation? I am no financier, but I am familiar enough with the liquidation that to me any assumption of that kind is merely fantastic."

Then on page 28 Mr. Laub, who is a record party here, and attorney herein, said:

"MR. LAUB:  Pardon me, I think the plan of resumption waives interest."

"THE COURT:  The statute says interest to or until a certain contingency happens. My notion is that waiver is not a waiver of the right, but a postponement to the same condition you have under §710-91. If I am not correct on that subject I would like to have some authority to the contrary."

"MR. ORMSBY:  (We insert, 'Mr. Ross Ormsby, counsel for the Superintendent of Banks')  If the court please, the evidence here in the record is that regardless of the interest question **the assets** remaining after payment of this dividend will still be paid only to depositors and creditors."

We should note the testimony of Superintendent of Banks Lien (pages 28 and 29) as to the assets remaining, which of course included the funds from stockholders liability.  Note Mr. Ross Ormsby's use of the word "assets" quoted just above. At this time practically all the stockholders liability that was ever collected was then in the Superintendent's hands, and the superintendent was estimating that they would be lucky if they got more than $4,000,000 for the $18,000,000 book value remaining.

Then on page 29 we find:

"THE COURT:  Getting back to what Mr. Laub spoke of paragraph 5 of the Resumption Plan * * * 'Participation Certificates in such assets, bearing no interest, will be issued to the depositors and creditors of the Superintendent of Banks.'

That is true, but the participation certificates do not bear interest. But what are the participation certificates? **They are merely evidence of the claim of the individual,** and there isn't a line there that says that if there is money available properly applicable to interest, that the depositor can't have it. That would be my construction."

"MR. LIEN: I think there was a case up at Sunbury, Ohio, * * * where a similar situation existed, **and the court there held that the depositor was entitled to interest.** I think it has never gone to the Supreme Court * * *."

NOTE: Without doubt he refers to the **Sun Banking case, 4 OO 519,** cited hereinbefore, which never was appealed.

Then Mr. Guinther, who is counsel here, and one of the drafters of the Plan, and who presented it to the six judges, on page 30 said:

"MR. GUINTHER: All the way through this subject we have always taken the view-point that until the depositor gets his principal, the question of interest is of no importance, and there is grave doubt whether the principal would be returned."

That was the feeling in January, 1942, and back in December, 1933, when the Plan was before the court and approved. The question of interest was not mentioned during the hearing before the six judges. The only interest mentioned by Mr. Sheck, attorney for the depositors, was interest, or the failure of the Plan to provide interest, on the $1,300,000 which went to the resuming bank. We have searched the transcript record of the case where the resuming plan was approved, and none of counsel, or any of the judges mentioned that interest would or would not be paid creditors and depositors if the contingency provided for under §710-91 arose. The Plan too was debated point by point.

Does not Mr. Guinther's statement to the court, in no way challenging Judge Fritch's interpretation, show that he felt that the question of interest was open but unimportant, as there was and would be no surplus?

Judge Fritch then said:

"THE COURT: It is primarily in the interest of the creditors and depositors of the bank, and nobody else. That is the thing we have kept in mind during the better than eight years now. That is the primary interest to be considered—the depositors and creditors of the closed bank."

We agree with Judge Fritch that the plan as adopted by the court calling for "Participation Certificates" in such assets, to be issued by the Superintendent of Banks, bearing no interest, and the issuance thereof, and the acceptance thereof by creditors and depositors, with the words "without interest" did not constitute a waiver of said creditors' and depositors' right to recover interest, if the contingency mentioned in §710-91 GC arose. The words "without interest" and the terms of the plan and decree in effect were but a postponement of the right to recover interest on the claim itself as provided in said section. (§710-91 GC).

The Certificate of Participation was merely evidence of the claim of the individual, the claim itself was not surrendered or cancelled, but the right to recover interest was postponed and dependent upon the contingent right. to recover interest when and if there were funds available out of which to pay it in accordance with §710-91 GC.

The words "without interest" and the terms of the plan and decree providing for such working were a further protection to the Superintendent of Banks in harmony with the banking statutes.

In Richert State Com. of Banking v Metropolitan Trust Company, 291 N. W. 228,* Michigan Supreme Court, we find:

Syllabus (6):

"The surrender by creditors of insolvent bank of certificates of deposit and the acceptance of non interest-bearing receivership claim certificates did not constitute an "accord and satisfaction' so as to prevent creditors from asserting right to interest on their claims where there were assets of insolvent bank remaining after full payment of all claims."

The facts do not show the form of certificate, nor discuss whether double liability was assessed. But it must have been, as the assets are shown as $968,000 and liabilities as $2,045,000.

As shown in 288 Michigan 646, cited above, Michigan, like Ohio, treats stockholders liability assessments as a trust fund for the benefit of creditors. But it shows in spite of that, that Michigan follows, and in this case (291 N. W. 228) cites with approval the U. S. case of 303 U. S. 406, Ticonic Bank v Sprague, which in turn cites and follows Richmond v Irons, 121 U. S.

---

*The printed record of the Supreme Court of Michigan shows that double liability was assessed and collected in that case, and that the "RECEIVERS PARTICIPATION CERTIFICATES" had printed on them in large letters at the top thereof this legend: "NON INTEREST BEARING."

27, which cases allow the creditor to recover interest at the legal rate.

See also 9 Zollman Banks and Banking (Perm. Ed.), page 484; Michigan Law Review, page 1069, etc. (June 1934)

3 Zollman Banks and Banking (Perm. Ed.), page 315, paragraph 1761. Interest on Debt to which Superadded Liability Attaches.

"Where a bank is so badly insolvent that the entire superadded liability of the stockholders when collected is insufficient to pay the principal of its debts, no question can arise whether its creditors are to receive interest. Any computation of such interest would be a useless effort * * *. It happens ('sometimes') that a portion of the superadded liability is sufficient to pay the principal of all debts. The question then arises whether the creditors are entitled to interest as against the stockholders. **It is clear that the contracts, debts and engagements of the bank have not been fulfilled so long as interest is unpaid.**"

"It may be a hardship on the stockholders to hold them for interest accruing during the delay of administration. It certainly is a hardship on the creditors to lose this interest. The question, however, is not one of hardship, but of legal right. Within the statutory limits the stockholder is bound for the whole debt and not a part of it. His superadded liability may be resorted to for such interest as would have been recoverable from the corporation had it continued solvent. * * *."

In **132 Oh St at page 183, Squire, Superintendent v Solinski,** the Ohio Supreme Court said:

"The intention of the electorate in adopting **Article XIII, Section 3 of the Ohio Constitution** (in re double liability) was to protect creditors. That construction must be given which will best protect them."

The present resuming bank, The First Central Trust Company, recognizes this principle in its current annual report to depositors just received in the mail, (January 14, 1944) where they say:

"We have been asked why we make an annual report to depositors while the custom is to do this only for stockholders. Our answer is that the first interest of a bank should be in its

depositors and their deposits. All that a bank does, all that it may wish to do, is dependent upon the volume of its deposits, which are the working tools of a bank, * * * etc."

In passing we might say that the resuming bank has succeeded admirably, and enjoys the fullest confidence of the public.

This protection of the depositor was indicated in the Booklet (Carter's Exhibit 19) which is "Questions and Answers" put out in book form, concerning the proposed plan of resumption. We refer especially to question and answer No. 65, as follows:

"65. Q. Why should I, as a depositor, sign the consent?

A. Because the Plan provides the quicket way of getting 20% of your frozen deposit to you **and gives up nothing of the rest of your claim to your money.** Further, because it increases the probability of full payment of your deposit since **liquidation** can be accomplished in a more orderly fashion and the right to resort to all **the assets of the Bank, including the liability of stockholders,** can be spread over a period of years. Immediate liquidation would probably result in a further depreciation of real estate values and other values and hurt the town generally." (Emphasis ours.)

(The 20% set forth was raised to 25% before the plan was adopted by the court.)

## CONCLUSION

In conclusion we hold that under the law of Ohio, without taking into consideration the plan of resumption, the depositors and other creditors would be entitled to receive the surplus remaining after payment of one hundred percent on principal claims, as damage interest, before stockholders would be entitled to receive anything back upon their superadded or double liability payments.

This is true even though the rule in Ohio is interpreted to be that the collection of stockholders superadded liability creates a trust fund for the benefit of creditors, and that said double liability is not an asset of the insolvent bank.

Further we hold that the plan of resumption as approved by the court in 1933 specifically made the stockholders assessed liability an asset of the bank to which depositors and other creditors could look for payment in full, which includes legal interest. The plan was so interpreted by the

reopening committee which drafted it and sponsored it before the six judge court.

The issuance of and acceptance of Participation Certificates bearing no interest did not waive the right of creditors to recover interest on their claims if and when a surplus existed after payment of principal in full.

Interest at the contract rate ceased when the Superintendent of Banks took over on June 21, 1933. Thereupon interest at the legal rate of 6% began to accrue on all claims of all creditors whether in the first instance they were drawing interest or not. In other words all creditors are to be treated alike. This interest would not become payable except out of a surplus which arose, as here, after depositors and other creditors received 100% of the principal of their claim. And this is true although part of the surplus or all of it may have arisen from payments made by stockholders upon their assessed stockholders liability.

The surplus then is ordered paid out as follows:

1. To the final and full expenses of liquidation including general court costs.

2. To the court costs of this action.

3. Balance to creditors generally, including depositors generally, as legal interest at 6% to be computed on a new balance of principal after each dividend was paid, from June 21, 1933, to date of payment.

It has been suggested by the brief of the Superintendent of Banks that there are certain classes of creditors, including depositors, who because of the peculiar facts in their case, are not entitled to any further payments. Those matters should be disposed of by the court upon proper presentation by the Superintendent before this opinion is considered filed officially. In other words, ample time and opportunity should be afforded the stockholders' group, so called, to perfect their appeal, so that this matter may be fully passed upon by the reviewing courts.

Proper notice by publication will be given by the Superintendent of Banks to those creditors and depositors concerning the time of hearing of the application to have the court determine what class or classes of creditors and depositors are and are not entitled to receive payment.

Finally, if there is not enough in the excess fund to pay all creditors and depositors entitled thereto their legal (6%) interest in full, which is a fact, they shall be paid pro rata.

Journal entry will be furnished by the Superintendent of Banks accordingly, with exceptions.